**PINEWOOD ESTATES OF MICHIGAN and Philou Associates, Ltd., Appellants,**

v.

**BARNEGAT TOWNSHIP LEVELING BOARD, Township of Barnegat, Barnegat Township Committee.**

**No. 89–5580.**

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1989.

Decided March 7, 1990.

---

**348**

Henry N. Portner (argued), Cherry Hill, N.J., for appellants.

Thomas G. Gannon (argued), Hiering & Hoffman, Toms River, N.J., for appellees.

Before STAPLETON, GREENBERG, and GARTH, Circuit Judges

OPINION OF THE COURT

GREENBERG, Circuit Judge.

## FACTS

Appellants, Pinewood Estates of Michigan and Philou Associates, Ltd., appeal from an order of June 20, 1989, granting, pursuant to Fed.R.Civ.P. 12(b)(6), a motion to dismiss by appellees, Barnegat Township Leveling Board, Township of Barnegat and Barnegat Township Committee. Appellants, which own and operate mobile home parks in the Township of Barnegat, New Jersey, rent space in their parks called pads to tenants who own their own mobile homes which they place on the pads. Appellants challenged the Barnegat rent leveling ordinance which they assert, in concert with applicable state law, effects an unconstitutional taking of their property without compensation. We will reverse the order of June 20, 1989, and will remand the matter to the district court.

The State of New Jersey regulates mobile home parks through the Truth–in–Renting Act, N.J. Stat. Ann. § 46:8–43 *et seq.* (West 1989), dealing with landlord-tenant relationships in general, and the Mobile Home Rights Act, N.J. Stat. Ann. § 46:8C–2 *et seq.* (West 1989), which is particularly concerned with mobile homes and mobile home parks.[1] The Truth–in–Renting Act is designed to facilitate the dissemination of information to tenants regarding their rights and to ensure that dwelling leases do not contain provisions inconsistent with the clearly established legal rights of tenants or responsibilities of landlords. Thus, it is procedural in nature. The Mobile Home Rights Act substantively regulates the relationship between mobile home residents and park operators and, as germane to this case, prohibits park operators from requiring park tenants to move or remove a mobile home solely because of the sale of the home. N.J. Stat. Ann. § 46:8C–3a (West 1989). The park operators may, however, reserve the right to

---

1. The title, Mobile Home Rights Act, seems to be the common reference to the statute rather than a name adopted by the Legislature. The Act is quite comprehensive and contains many provisions which we do not describe.

approve buyers of homes in their parks as tenants, but cannot withhold approval unreasonably or exact a commission or a fee for the sale of homes unless earned as an agent pursuant to a written contract. *Id.* The Mobile Home Rights Act authorizes municipalities to adopt further regulations and licensing requirements for mobile home parks. N.J. Stat. Ann. § 46:8C–8 (West 1989). In a third law, New Jersey limits evictions of mobile home tenants to statutorily defined good cause. N.J.Stat. Ann. § 2A:18–61.1 (West 1987).

The Township of Barnegat has adopted a rent leveling ordinance, Ordinance No. 1977–19, which controls mobile home space rentals. Section 64.2 of the Barnegat Ordinance establishes the following formula for determination of rent:

§ 64.2 Determination of rents.

A. The establishment of rents between a landlord and a tenant to whom this ordinance is applicable shall hereafter be determined by the following provisions:

(1) At the expiration of the tenancy for a mobile home space, no landlord may request or receive any increase in the rental income or additional charges for that mobile home space from any tenant, new or continuing, which is greater than a combination of the following:

(a) Any increased cost to the landlord for utilities.

(b) Any increased cost to the landlord in mobile home space fees or license fee charged by the Township of Barnegat pursuant to any duly adopted ordinance.

(c) Any amount equal to three and one-half percent (3½%) of the previous twelve-month rental income for the mobile home space or the percentage increase in the consumer price index over the twelve-month period ending one hundred twenty (120) days prior to the date of application for said increase, whichever shall be less.[2]

Notably, the Barnegat Ordinance does not have a provision for vacancy decontrol permitting a mobile park owner to negotiate a new rent when a tenant removes a mobile home from a pad ending his tenancy and a new tenant moves in.

Appellants filed this action against the appellees in the United States District Court for the District of New Jersey on June 13, 1988, alleging that the Barnegat Ordinance takes their property without compensation by transferring possessory interests in it to their tenants in violation of the Fifth Amendment, made applicable to the appellees by the Fourteenth Amendment. The appellants alleged that such transfers constituted physical occupations of their properties in perpetuity and that these transferred possessory interests were marketable and valuable and were alienable by tenants who could realize income over the actual value of a mobile home by selling the mobile homes at a premium, reflecting the value of the possessory interest in the pad.[3]

On April 27, 1989 the appellees filed their motion to dismiss, asserting that the Barnegat Ordinance passes firmly established constitutional standards for regulatory ordinances.[4] After oral argument, the

---

2. While the appellants did not so allege in their complaint, we think that it is only fair to point out the Barnegat Ordinance has provisions for rent surcharges for property tax increases, hardships, and major capital improvements.

3. In their complaint appellants asserted that the district court had jurisdiction under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983. On remand they may move to amend the jurisdictional allegations to assert jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3) and (4). In addition to alleging a violation of the Fifth Amendment by reason of the taking, appellants asserted that the Barnegat Ordinance denied them equal protection of the

law and denied them due process of the law because it is arbitrary, capricious, and unreasonable and had no public purpose. The district court did not directly deal with these contentions and thus neither do we as we are not required to do so in deciding this appeal. Rather, we are reinstating the complaint and appellants may proceed on all theories set forth therein. We do not express any opinion on those issues we do not directly address.

4. The motion to dismiss was filed under Fed.R. Civ.P. 12(b)(1) as appellees contended that the district court lacked subject matter jurisdiction. The district court, however, seems to have treated it under Fed.R.Civ.P. 12(b)(6), as it indicated,

district court granted the motion in a memorandum opinion of June 20, 1989, holding that the Barnegat Ordinance, rather than effecting a taking by physical occupation, was a constitutional regulatory ordinance. This appeal, over which we have jurisdiction under 28 U.S.C. § 1291, was filed on July 13, 1989.

## ANALYSIS

On this appeal we must determine whether the appellants have alleged facts sufficient to support a claim that the Barnegat Ordinance has affected their property rights to an extent requiring compensation. Inasmuch as this matter is before us on an appeal from an order granting a motion to dismiss, we assume that all the factual allegations in the complaint could be proven. On that basis we find that appellants have alleged sufficient facts to support a finding that the Ordinance, in conjunction with state law, provides for a permanent physical occupation constituting a taking without provision for compensation in violation of the Fifth and Fourteenth Amendments.

Inasmuch as the Fifth Amendment, applicable here through the Fourteenth Amendment, *see Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 231–32, 104 S.Ct. 2321, 2324, 81 L.Ed.2d 186 (1988), provides that "private property [shall not] be taken for public use, without just compensation," we are concerned with the meaning of "property" and "taken" within the Amendment. The Supreme Court has eschewed a literal interpretation of "property", instead adopting a more expansive approach described in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 83 n. 6, 100 S.Ct. 2035, 2041 n. 6, 64 L.Ed.2d 741 (1980) as follows:

> The term 'property' as used in the Takings Clause includes the entire 'group of

rights inhering in the citizen's [ownership].' It is not used in the 'vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. [Instead it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . .' [Citations omitted.]

The question of what constitutes a taking has "proved to be a problem of considerable difficulty." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Supreme Court has recognized two categories of takings, regulatory and physical, a critical distinction as the Court has taken significantly different analytical approaches in determining what constitutes a regulatory as compared with a physical taking.

While it is possible for a restriction on the use of property to so diminish its value as to require compensation, the Supreme Court has upheld many restrictions which significantly impact on property values but do not provide for compensation. *Id.* at 127, 98 S.Ct. at 2661. Thus, in *Penn Central* the property owners alleged that New York City's Landmarks Preservation Law, which prevented them from erecting a high rise office tower above Grand Central Station, effected a taking for public use without just compensation. Recognizing that the challenged governmental action was regulatory, the Court considered whether justice and fairness required compensation, and thus whether a taking had occurred, and concluded it had not.[5] The Court highlighted several factors of particular significance:

> The economic impact of the regulation on the claimant and, particularly, the extent

---

citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), that the motion could be granted only if appellants could prove no set of facts in support of their claim entitling them to relief. That was undoubtedly the correct approach, *see Lunderstadt v. Colafella*, 885 F.2d 66, 69–70 (3d Cir.1989), and is the standard we follow as well.

5. *Id.* at 124, 98 S.Ct. at 2659. In making its factual inquiry the Court noted that it had been unable to

> develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.

*Id.* at 124, 98 S.Ct. at 2659.

to which the regulation has interfered with distinct investment-backed expectations are, of course relevant considerations. So too, is the character of the governmental action.

*Id.* at 124, 98 S.Ct. at 2659.

On the other hand, physical takings involve occupation of property and, as distinguished from cases involving claims of regulatory taking, when the Supreme Court has found that there has been a permanent physical occupation of private property, it has invariably found a taking.[6] In such cases the character of the governmental action rather than the economic impact on the owner determines whether there has been a taking requiring compensation.

Thus, the Supreme Court has recognized that while a regulatory limitation on the right to use and receive profits from property will not necessarily or even usually establish that there has been a taking, permanent physical occupation will, "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). As the *Loretto* Court stated:

> [s]uch an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion.

*Id.* at 436, 102 S.Ct. at 3176. (Emphasis in original.)

Accordingly, where it has found that the government has permanently occupied, or authorized a third party to occupy permanently, the private property of another, the Court has consistently held that a physical taking has occurred and that there has thus been a per se taking under the Fifth Amendment. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987); *Loretto*, 458 U.S. at 440–41, 102 S.Ct. at 3178–79. In contrast, the Court may uphold a regulation on the use of property against a claim that there has been an uncompensated taking, even though the economic impact of the regulation on the property owner is far more severe than a minor physical occupation which requires compensation.

Appellants have stressed in their briefs, both here and in the district court, that their claim is based on allegations that there has been a permanent physical occupation of their property resulting from a transfer of a possessory interest by the operation of the Barnegat Ordinance.[7] Thus, the gravamen of their complaint was that the Barnegat Ordinance has transferred from the appellant landlords to the tenants an alienable and valuable possessory interest in a pad which "constitutes a physical occupation in perpetuity" by present or future tenants. As the district court aptly stated in its memorandum opinion:

**6.** *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). There the Court held that a state law requiring owners of apartment buildings to allow cable television companies to install their cable facilities upon the apartment properties, effected a taking per se by permanent physical occupation.

**7.** At oral argument appellants maintained that the language of their complaint supports a claim for an unconstitutional regulatory taking as well as a physical taking. This argument was never raised before the trial court or in appellants' brief to this court. In fact, in both their memorandum in opposition to appellees' motion to dismiss and their brief here appellants argued that their complaint "is based on the *physical occupation of their property*." [Emphasis in originals.] Furthermore, in their memo-

randum and brief, appellants distinguished appellees' citations as being "regulatory taking cases, not cases reviewing the taking by physical occupation. The distinction is paramount." This approach is completely consistent with the argument forwarded at oral argument before the district court where appellants stated:

> Your Honor, I have attempted—to very narrowly define the issue which I am attempting to bring before this court, which is, there has been a physical taking, a physical occupation of property. I have tried to distinguish these line of cases from a regulatory type of case.

Since the appellants never raised the argument in the district court that the Barnegat Ordinance effected an unconstitutional regulatory taking, and in fact until oral argument before us argued consistently it was not a regulatory taking, we will not entertain the argument on appeal.

The plaintiffs [appellants] are concerned primarily with three New Jersey or Barnegat Township statutes and ordinances which they claim operate to create a situation wherein it is next to impossible for them to sell their land because the effect of the rules is to create in present residents a marketable interest in the plaintiff's property; furthermore, they assert that this interest passes to the new tenants upon resale of the mobile home, rather than to the landowner.

The appellants' complaint must be considered against the Fifth Amendment law above described. Appellants make several specific allegations as to the effect of the Barnegat Ordinance's operation in conjunction with the Mobile Home Rights Act. They allege that the New Jersey statutes prevent the removal by the park operator of a mobile home upon its sale and that in fact mobile homes are rarely, if ever, removed. It is further alleged that the Barnegat Ordinance controls the rents chargeable on each pad without provision for vacancy decontrol which would permit appellants to negotiate with new tenants, when others leave the park, for rents free of the Barnegat Ordinance's limitations. The result, according to appellants' complaint, is that the mobile home owners, the tenants, are given valuable and alienable possessory interests to occupy park pads with a controlled rent—a possessory interest which belongs to the appellants. Consequently, the appellants assert that they have been deprived, without compensation, of a possessory interest in their property, and that such interest runs with the land in perpetuity. Appellants allege that their tenants may realize the value of this interest by charging premiums upon the sale of their mobile homes over what the mobile homes would be worth if not located in a park.[8] Consequently, the appellants assert that their tenants have been given a transferable possessory interest in the appellants' property which runs with the land in

perpetuity and that appellants have been deprived of this interest without compensation.

The district court concluded that these allegations did not state a cause of action as it regarded the challenged ordinance as a constitutional regulation. It noted that "almost uniformly, a foreign physical presence must be put on the property in question for a court to treat the case as a 'physical occupation' case." The district court observed that rent control regulations "consistently have been upheld as being non-confiscatory."

The district court was correct in noting that the typical physical occupation case involves a government action resulting in a palpable and permanent invasion by a foreign physical presence. Thus, in *Loretto,* a permanent physical occupation, though seemingly of slight impact as it involved the placement of wires and minimal related equipment for transmission of television signals in an apartment house, was a per se taking because of the impact the governmental action had upon the property owner's right to "possess, use and dispose" of her property. 458 U.S. at 435, 102 S.Ct. at 3176. The Court held that the permanent physical occupation effectively destroyed the right of the property owner to possess property to the exclusion of others, a right which it characterized as one of "the most treasured strands in an owner's bundle of property rights." *Id.* The Court reiterated that the governmental action denied the owner the power to control the use of her property, a factor which, while not necessarily sufficient to establish that there had been a taking, was clearly relevant to a resolution of that issue. The Court also held that the bare legal right to dispose of the property was stripped of any value as the permanent occupation of that space will render any purchaser unable to make use of the property. *Id.* at 435–36, 102 S.Ct. at 3176.

---

**8.** While not alleged by appellants in their complaint, park operators are precluded by the Mobile Home Rights Act from sharing in this premium, *see* N.J. Stat.Ann. § 46:8C–3a (West 1989), and in any event are in no position to do so since they usually cannot exclude the purchaser of a mobile home on an existing pad from the park.

The appellants have alleged that the Barnegat Ordinance has the same impact on their property rights and, taking the allegations of their complaint as true, we agree. Indeed, the physical invasion of their properties and the uncompensated creation of interests in them worked by the Barnegat Ordinance in connection with the state law is far more pronounced than that in *Loretto*. Here, there has been a permanent transfer of the appellants' possessory interests to each tenant to occupy a rent controlled pad. Thus, although the interest belongs to the appellants, the landlords, the effect of the law is to transfer the interest, without compensation, from the landlords to the tenants. Accordingly, a tenant may, by determining the purchaser of his mobile home, select the new tenant for the park and command a premium for the alienation of the right to occupy the pad at a controlled rent to the complete exclusion of the appellants. The combined impact of the statute and the ordinance operates to deprive the appellants of their possessory interest in the pad permanently.

Yet the purchaser of a mobile home who pays a premium for the right to keep the home in a mobile home park pays for the cost of the tenancy rather than for the mobile home. Thus, the premium is nothing more than rent for the pad which, depending upon whether the purchase is financed or paid for in cash, the new tenant pays during his tenancy or in advance.[9] But this rent is paid not to the appellants who own the parks but to the prior tenant who, by virtue of the Barnegat Ordinance and state law has been granted a valuable alienable possessory interest in the park. The premium can be extracted because of the absence of vacancy decontrol for if there were no controls the park owners would, at least in theory, increase the rents to the level that would eliminate the willingness of a new purchaser to pay a premium to locate the mobile home in the park. In our view, the essential aspect on which we must focus is not that the tenant may receive additional compensation, but that the landlords are deprived of this compensation for their loss of a possessory interest.

Overall, we are quite satisfied that appellants have pleaded a cause of action. The operation of the Barnegat Ordinance in connection with state law has created valuable property interests for which appellants have not been compensated. Furthermore, if the rather minor intrusion in *Loretto* was deemed a physical invasion then the gross intrusion here must be so classified. This is not a case in which a property owner has simply been told that he cannot do something on his property or that he must use his property a certain way. The situation is aggravated by the fact that the transfer is accompanied by the payment not to the landlord but to the departing tenant of what amounts to rent for the use of the pad. This "rent" is for the possessory interest of the landlord. Thus, this is a case where other persons, tenants, have been granted interests in property which properly belongs to the appellants, the landlords. We acknowledge, of course, that appellants may receive a constitutionally adequate rent for the occupancy of the tenants as such, but that fact is not material to our analysis for, according to the complaint, they receive nothing at all for the taking of the alienable physical property interest vested in their tenants.[10]

The fact that our result may have a significant impact on the relationship between tenants and mobile park operators has not escaped our notice but we point out that it is not novel as the United States Court of Appeals for the Ninth Circuit reached a conclusion similar to ours in *Hall*

**9.** It is ironical that while the Legislature has precluded the park owner from collecting a fee or commission from the sale unless it has acted as the agent of the owner, it has not forbidden the mobile home owner from charging the premium.

**10.** We realize that it could be argued that the appellants are not prejudiced by the Barnegat Ordinance since under a straight rent control plan in which they select their own tenants and a tenant when moving must remove his mobile home, their incomes might be no more than they are now. But such an argument would miss the point as this is a physical invasion case in which the actual economic impact on appellants is accorded little weight.

**354**

*v. City of Santa Barbara,* 833 F.2d 1270 (9th Cir.1986), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). In *Hall,* the appellants challenged an ordinance of Santa Barbara, California, governing mobile home parks, as effecting a taking by permanent physical occupation. That ordinance required that tenants be offered leases of unlimited duration, terminable at will by the tenant, but only for good cause as defined in the ordinance by the park owner. The ordinance also provided for rent control on park pads. Additionally, as in New Jersey, California normally precluded park operators from forcing tenants to remove mobile homes.

The appellants in *Hall* alleged that the ordinance transferred to each tenant a possessory interest in the land on which the mobile home is located. 833 F.2d at 1274. They further alleged that a tenant could receive a premium for this interest, upon the sale of his mobile home, reflecting the transfer of a valuable property right to occupy mobile home parks at a below market rate. *Id.* The court held that these allegations were sufficient to state a claim for taking by physical occupation. *Id.* at 1276.

In so holding, the *Hall* court looked to the rationale of *Loretto.* The court focused, as we do now, on the impact a permanent physical invasion has upon a property owner's rights. *Id.* at 1277. In *Hall,* as here, it was the transfer to a tenant of an alienable interest in land which formed the crux of the constitutional challenge. The alleged right of the tenant, and his chosen successors, to occupy the rent controlled pad in perpetuity, led the *Hall* court to find that a claim for a taking by physical occupation had been presented.[11]

We have not overlooked *Troy Ltd. v. Renna,* 727 F.2d 287 (3d Cir.1984). In *Troy* the appellants challenged the New Jersey Senior Citizens and Disabled Protected Tenancy Act, which greatly limited a landlord's ability to evict senior citizens and disabled persons from rental apartments upon conversion of the apartments to condominiums. Qualified tenants obtained a right to remain in converted units for up to forty years. We held that the Tenancy Act "is clearly not a taking of property under the *Loretto* standard of permanency," *id.* at 301, as no permanent occupation was authorized. Furthermore, we found that there was no "public use" of

---

**11.** We note that the *Hall* court suggested that it "may well be that the rental payments (together with such increases as are permitted under the ordinance) adequately compensate the Halls for the taking of their property. However, this cannot be assumed; it must be proven. To make this determination, the court must ascertain the value of the interest allegedly transferred to each tenant and the value of what the Halls received, if anything, in addition to normal rental payments. All these are matters that must be considered by the district court on remand." 833 F.2d at 1281.

We are not to be understood as endorsing such an approach. First of all the matter is here on an appeal from an order granting a motion to dismiss and thus we are only concerned with the sufficiency of the complaint. Furthermore, under our analysis the Barnegat Ordinance, in concert with state law, has effectively transferred the right to designate a new tenant, and to collect part of the rent from him, to the old tenant rather than leaving it with the appellants, the landlords. The Ordinance, does not even purport to provide for compensation for that taking from the appellants. Thus, the appellees do not suggest that the Barnegat Ordinance takes into account that market conditions

will create a premium for mobile homes on existing pads and provides for compensation to park operators for the value of that premium. Indeed, it appears that the starting point for the rents was simply the rent level in place prior to the adoption of the Barnegat Ordinance. Accordingly, we will assume that the overall income from the park provides for a just and reasonable return and otherwise satisfies New Jersey and constitutional law, *see Mayes v. Jackson Tp. Rent Leveling Board,* 103 N.J. 362, 366–67, 511 A.2d 589, 591 (1986), and that the Barnegat Ordinance to the extent that it is regulatory is valid. But that premise can no more justify the uncompensated taking described here than could the circumstances that the property owner in *Loretto* may have received what was overall a just and reasonable return on her property could have justified the uncompensated taking there. The point is that a particular taking—here a taking of the appellants' possessory interest—must in itself be compensated. The Supreme Court required that in *Loretto* and we cannot hold otherwise. We have addressed this point at length as we do not want the parties to infer that by citing *Hall* we necessarily are following all of that opinion.

the property involved. Rather its use was regulated. Thus, finding no permanent taking for a public use, we held that the Tenancy Act was a constitutional exercise of the state's police power. *Id.* at 302.

The Barnegat Ordinance is alleged, however, to operate in ways which are profoundly different, and which impact more seriously upon appellants' property rights than the regulations considered in *Troy.* There was no suggestion in *Troy* that the landlords were deprived of alienable and valuable property interests. In addition, while the tenancies could be protracted, they were of finite duration and would end when the tenants died or moved from the property. Accordingly, the tenants were not granted rights in the property similar to those of the tenants in the appellants' parks. Furthermore, the Tenancy Act upheld in *Troy* allowed the landlord and not the tenant to select the new occupant upon an apartment becoming vacant. Clearly, the Barnegat Ordinance, as it is alleged to operate, goes well beyond the regulation of the apartment conversions and holdover tenancies we considered in *Troy.*

Nor is there any tension between this case and the legion of the cases[12] upholding

apartment rent control. Two significant differences exists between mobile home regulations now subject to the New Jersey rent control statute and the Barnegat ordinance and the typical urban rent control. First, in urban apartment rent control it is the landlord who chooses, selects, and rents to the new tenants. No other party can sell the right to occupy the landlord's premises. Second, the tenant cannot occupy in perpetuity. Thus, the tenant does not acquire an inheritable right; *see Troy,* 727 F.2d at 301.

In view of the aforesaid, we will reverse the order of June 20, 1980, and will remand the case to the district court for further proceedings consistent with this opinion.

STAPLETON, Circuit Judge, concurring:

I agree that where the state permanently takes away a landlord's right to evict a tenant and his successors beyond the end of an agreed upon term a permanent physical occupation occurs and there is a *per se* taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).[1] This would accurately characterize this case

---

12. *Fisher v. City of Berkeley,* 471 U.S. 1124, 105 S.Ct. 2653, 86 L.Ed.2d 270 (1985) (dismissing appeal of ruling that rent control statute need not provide landlord a reasonable return on his investment); *Fresh Pond Shopping Center, Inc. v. Callahan,* 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983) (dismissing appeal of ruling upholding rent control statute limiting right to remove a tenant to a situation in which a unit is wanted for personal use of the landlord or its family); *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596 (1948) (upholding rent limits on certain accommodations in "defense-rental areas" as a valid exercise of the war power); *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) (upholding District of Columbia rent control ordinance as a temporary measure).

1. Though the Supreme Court has uniformly upheld regulations of the landlord-tenant relationship as non-confiscatory, *see Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921); *Fresh Pond Shopping Center, Inc. v. Callahan,* 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983) (appeal dismissed for want of substantial federal question), none of these decisions suggest that prohibitions on the removal of tenants after the expiration of their

lease terms should be analyzed as regulatory burdens instead of as physical invasions. Furthermore, all of the relevant Supreme Court opinions contain language which suggests that such schemes, if of sufficient duration, would constitute takings. *See Loretto,* 458 U.S. at 440, 102 S.Ct. at 3178 (citations omitted) ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party."); *Bowles,* 321 U.S. at 517, 64 S.Ct. at 648 ("We are not dealing here with a situation that involves a 'taking' of property. By § 4(d) of the Act it is provided that 'nothing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent.'"); *Block,* 256 U.S. at 157, 41 S.Ct. at 460 ("The regulation is put and justified only as a temporary measure. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.").

were it not for the fact that Pinewood is free to evict any tenant if it decides to devote the land occupied by the tenant to a different use.[2] As I read *Loretto,* this fact does not keep the state's action from constituting a permanent physical occupation and therefore a *per se* taking. In response to an argument that the landlord in *Loretto* could avoid the physical occupation by devoting his property to a purpose other than rental apartments, the Supreme Court observed:

> Insofar as Teleprompter means to suggest that this is not a permanent physical invasion we must differ. So long as the property remains residential and a CATV company wishes to retain the installation, the landlord must permit it.... It is true that the landlord could avoid the requirements of § 828 by ceasing to rent the building to tenants. But a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation. The defendant's broad "use-dependency" argument proves too much. For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices. The rights of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated.

458 U.S. at 439 & n. 17, 102 S.Ct. at 3178 & n. 17.

For these reasons, I join in the court's disposition of this appeal.

---

**2.** New Jersey permits the eviction of apartment and mobile home tenants where "the owner seeks to retire permanently the residential building or the mobile home park from residential use or use as a mobile home park...." N.J.Stat.Ann. § 2A:18–61.1 (West 1987).